United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SERGIO IVAN CHAPARRO AYALA,
Plaintiff,

v.

SERGIO ALBARRAN, et al.,
Defendants.

Case No. 26-cv-09430-CRB

**ORDER GRANTING PRELIMINARY INJUNCTION**

Petitioner Sergio Ivan Chaparro Ayala was detained by federal immigration agents on August 28, 2026. Pet. (dkt. 1) ¶ 1. Mr. Ayala argued that his detention violated the Due Process Clause of the Fifth Amendment and sought immediate relief. Mem. in Supp. of Mot. for TRO ("TRO Mem.") (dkt. 5-1) at 7. After reviewing Mr. Ayala's motion, and the government's response, Resp't's Resp. to Mot. For TRO ("TRO Resp.") (dkt. 6), this Court granted the TRO and ordered Mr. Ayala's immediate release from custody while enjoining Respondents from re-arresting him before he can contest his detention before a neutral tribunal. Order (Dkt. 8).[1] The Court simultaneously treated Mr. Ayala's original motion as a motion for preliminary injunction and ordered the parties to brief the motion before a hearing on September 15, 2026. Now, with the benefit of full briefing and that hearing, the Court turns to the question of whether Mr. Ayala is entitled to lasting preliminary relief. The Court concludes that he is.

## I. BACKGROUND

Mr. Ayala is a citizen and national of Mexico. TRO Resp. (dkt. 6) at 1. He was

[1] The government confirmed it released Mr. Ayala from custody on September 4, 2026. Status Rep. (dkt. 9).

admitted to the United States on August 22, 2019, as a tourist. Id. Although Mr. Ayala's permission to remain in the country expired in 2020, Resp't's Resp. to Order to Show Cause ("PI Resp.") (dkt. 11) at 2, Mr. Ayala remained in the United States past that date and has resided here ever since. TRO Mem. at 8. In the intervening years, Mr. Ayala has stayed in the San Francisco Bay Area, where he has a partner, works at a local restaurant, financially supports two children, and holds "strong community relationships." Pet. ¶¶ 47–50.

On August 28, 2026, Mr. Ayala and his partner were at Oakland International Airport for a domestic flight to Las Vegas when he was detained by U.S. Immigration and Customs Enforcement ("ICE") agents. Id. at ¶¶ 7, 59. ICE placed Mr. Ayala into removal proceedings under 8 U.S.C. § 1227(a)(1)(B) that same day. TRO Resp. at 2. Mr. Ayala's status as a community member was significant enough that his arrest generated local press coverage. See TRO Mem. at 8.

Mr. Ayala suffers from several health conditions that made his detention potentially dangerous—most prominently, severe sleep apnea that Mr. Ayala treats with a CPAP machine at night. Id. ¶ 15. Without treatment, Mr. Ayala risked heart attack. Id. ¶ 52.

Mr. Ayala filed a petition for a writ of habeas corpus on September 2, 2026, raising claims under the Fifth Amendment and conditional claims under the Fourth Amendment and the Administrative Procedure Act. Id. He filed his motion for a TRO the same day, seeking relief from this Court based on the alleged violations of his Fifth Amendment Due Process rights. TRO Mem. Respondents filed their response on September 2, 2026. TRO Resp. This court granted the TRO two days later. Order. It now assesses whether to issue a preliminary injunction on the same grounds.

## II. JURISDICTION

District courts have jurisdiction to hear habeas petitions for prisoners who demonstrate they are "in custody in violation of the Constitution." 8 U.S.C. § 2241. Nonetheless, the government contests the Court's subject matter jurisdiction in their preliminary injunction briefing, arguing that under 8 U.S.C. § 1226(e), the Court cannot

"set aside any action or decision by the Attorney General under this section regarding the detention of any alien." PI Resp. at 11–12. As they see it, this Court "seemingly sua sponte conducted its own custody redetermination of ICE's decision to detain Petitioner, notwithstanding Congress's explicit prohibition of its jurisdiction." Id. at 12.

Courts are required to raise and address jurisdictional questions "whenever a doubt arises." Flanagan v. CitiMortgage, Inc., No. 18-cv-1503-LAB, 2019 WL 1040138 (S.D. Cal. 2019) (citing Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 278 (1977)). And courts should assess jurisdiction before proceeding to the merits whenever possible. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) ("[W]hen [jurisdiction] ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

The Court concludes it has jurisdiction to hear this claim. While federal courts generally lack jurisdiction to review "discretionary bond decisions," this prohibition "does not preclude 'habeas jurisdiction over constitutional claims.'" Soriano v. Hernandez, 830 F. Supp. 3d 1071, 1078 (W.D. Wa. 2026) (quoting Hernandez v. Sessions, 872 F.3d 976, 987 (9th Cir. 2017)); Singh v. Holder, 638 F.3d 1196, 1202 (9th Cir. 2011), abrogated on other grounds by Jennings v. Rodriguez, 583 U.S. 281 (2018) (plurality opinion); Martinez v. Clark, 124 F.4th 775, 781 (9th Cir. 2024) ("[Section 1226(e) restricts jurisdiction only with respect to the executive's exercise of discretion but that discretionary judgment does not include constitutional claims." (quotations omitted)). Mr. Ayala's Due Process claim fits neatly into this category.

Further, this Court does not overstep this jurisdictional grant by considering Mr. Ayala's danger to the community or flight risk. Immigration bond decisions happen in two phases: there is an "initial custody determination . . . made by an ICE officer . . . [when] the government may release the alien on bond or conditioned parole" if the detained individual demonstrates to the officer that "such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." Rico-Topia v. Smith, 806 F. Supp. 3d 1166, 1179 (D. Haw. 2025) (citations

United States District Court
Northern District of California

omitted). Then, there is "a hearing before an immigration judge" to make a substantively similar determination about flight risk and danger to the community. Id. Assessing an immigrant's dangerousness and flight risk are both mixed-questions of fact and law. See Andriasyan v. Warden, No. 26-cv-01361-JAK, 2026 WL 1850059, at *9 (C.D. Cal. April 24, 2026). Thus, while federal courts cannot re-weigh the evidence from initial bond determinations, they can assess whether the proof relied upon could not support the conclusion reached as a matter of law. See Kharis v. Sessions, No. 18-cv-04800-JST, 2018 WL 5809432 (N.D. Cal. Nov. 6, 2018). They routinely do so. See, e.g., Flores Velazquez v. Hernandez, No. C26-1846-SKV, 2026 WL 1815731 (W.D. Wa. June 24, 2026).

## III. LEGAL STANDARD

A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The "[l]ikelihood of success on the merits 'is the most important Winter factor.'" Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (quoting Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015)). However, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two Winter factors are satisfied." Friends of the Wild Swan v. Weber, 767 F.3d 936, 942 (9th Cir. 2014) (quotation marks and citations omitted). "[W]hen the Government is the opposing party," the final two factors "merge." Nken v. Holder, 556 U.S. 418, 435 (2009).

## IV. DISCUSSION

The Court finds that all Winter factors have been met. Each factor is examined in turn.

### A. Likely Success on the Merits

Mr. Ayala shows he is likely to succeed in his Fifth Amendment procedural due process claim,[2] or at minimum, that it presents a serious question going to the merits which, when combined with the other Winter factors, is sufficient for preliminary relief.

The Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

This Court has already concluded that the three-part test from Mathews v. Eldridge, 424 U.S. 319, 335 (1976), applies in the immigration detention context. Y.M.C.P. v. Alberran, No. 26-cv-08341-CRB, 2026 WL 2497562, at *3 (N.D. Cal. Aug. 25, 2026); see also Claros v. Albarran, 811 F. Supp. 3d 1062, 1066 (N.D. Cal. 2025) (collecting similar cases). Mathews requires consideration of (1) the private interest affected; (2) the risk of an erroneous deprivation; and (3) the government's interest. 424 U.S. at 335.

#### 1. Private Interest

When immigrants are detained by the government and then released conditionally, they have a liberty interest arising from the "implicit promise" of that release. Garro Pinchi v. Noem, 792 F. Supp 3d 1025, 1032 (N.D. Cal. 2025) (quoting Morrissey v. Brewer, 408 U.S. 471, 482 (1973)). That is so even when the initial decision to release an individual results from the exercise of discretion. Cordero Pelico v. Kaiser, No. 25-cv-07286-EMC, 2025 WL 2822876, at *6 (N.D. Cal. Oct. 3, 2025)) (citing Calderon v. Kaiser, No. 25-cv-6695-AMO, 2025 WL 2430609, at *2 (N.D. Cal. Aug. 22, 2025)). Non-citizens detained at ICE check-ins after their initial release are subject to 8 U.S.C. § 1226(a), which allows for the exercise of discretion. See Rodriguez Vazquez v. Bostock, 183 F.4th 1160 (9th Cir. 2026); 8 U.S.C. § 1226(a) ("the Attorney General (1) may continue to detain the arrested alien; and (2) may release the alien on . . . conditional

---

[2] In issuing the TRO, the Court concluded that the arguments for Mr. Ayala's substantive due process claim largely mirrored those in favor of his procedural due process claim. Order at 8. Accordingly, the parties overwhelmingly focused their briefing on the issue of procedural due process, and this Court does so as well in this Order.

parole."). And still, "a noncitizen released from custody pending removal proceedings has a protected liberty interest in remaining out of custody." Cordero Pelico, 2025 WL 2822876, at *6.

But Mr. Ayala was never conditionally released by the government because Mr. Ayala was never before detained by them. TRO Resp. at 7. The government argued that without a former detention, the implicit promise of release does not exist and there is no liberty interest at stake in detaining Mr. Ayala for a first time. Id. at 7–8. This argument oversimplifies Mr. Ayala's Due Process rights. When the government makes "a decision not to detain [someone] in the first place," that decision can create "the same liberty interest in [that person's] continued freedom as an individual initially detained." Kharitonova v. Albarran, No. 26-cv-01362-JSC, 2026 WL 531441, at *2 (N.D. Cal. Feb. 25, 2026); see Jambwa v. Warden of the Desert View Annex Det. Facility, No. 26-cv-04357-PD, 2026 WL 2449550, at *1–*2 (C.D. Cal. Aug. 20, 2026) (finding that "Petitioner acquired a liberty interest because the government implicitly acquiesced to his continued release when it did not detain him after his visa expired and instead granted him employment authorization while his asylum claim was pending" and collecting similar cases); Norberto C.M. v. Warden, Cent. Valley Annex, No. 26-cv-04674-MWJS, 2026 WL 1992747, at *4 (E.D. Cal. July 9, 2026) (same). This is particularly true where an individual forms the "attachments of normal life" while residing in the country for many years. See Morrissey, 408 U.S. at 482; see also Kharitonova, 2026 WL 531441, at *3 (noting the length of a petitioner's residency in the United States in assessing the strength of their liberty interest). "Courts have recognized that, with the passage of time, a protectable liberty interest can 'crystallize[].'" Guillermo M. R. v. Kaiser, 791 F. Supp. 3d 1021, 1030 (N.D. Cal. 2025) (quoting Hurd v. D.C., Gov't, 864 F.3d 671, 683–84 (D.C. Cir. 2017)). Mr. Ayala has formed such attachments. See Pet. ¶ 47 ("Petitioner settled into life in the United States [and has] . . . establish[ed] strong family and community ties in the San Franscisco Bay Area."); id. ¶ 48 (Petitioner "lived with, cared for and supported his partner and minor children in the United States"); id. (Petitioner's "12- and 14-year old

United States District Court
Northern District of California

children[] rely on Petitioner for financial support"); id. ¶ 49 (Petitioner "was working at a local restaurant and had recently been promoted to shift supervisor"); TRO Mem. at 8 ("[R]egular customers of the restaurant [where Petitioner works] noted his absence immediately.").

The government argues that Mr. Ayala's case is distinguishable because he "did not have a single incident of contact with any federal government agency" prior to his detention. PI Resp. at 6–7. But this fact is not determinative. While it is certainly relevant if a detained immigrant has had prior interactions with the federal government, individuals can obtain liberty interests even without them. See Carreno Ortiz v. Albarran, No. 26-cv-8708-WHO (N.D. Cal. Aug. 28, 2026) (finding that an immigrant who had "overstayed her visa" and had not had "any contact with immigration authorities prior to her arrest" had "a strong liberty interest in remaining free from custody," while denying a TRO on other grounds); see Chiguil Chiguil v. Noem, No. 26-cv-1844 DAD CSK, 2026 WL 913195, at *5 (E.D. Cal. April 3, 2026) (collecting cases showing that even "noncitizens . . . who entered the United States without encountering immigration authorities or being paroled into the United States" can still "retain a liberty interest in being free from imprisonment").[3] Courts routinely look to factors like the length of a person's residency, their work history, and their community ties—not just whether they were previously released by immigration authorities—in assessing an immigrant's liberty interest. See, e.g., Rico-Tapia, 806 F. Supp. 3d at 1183. Whether Mr. Ayala has a liberty interest is thus not so simple that it can be reduced to a single question. Few rights are.

Indeed, the government's reasoning has troubling implications when stripped down to its essentials: under their framework, a person's interest in being free would depend on the government first depriving them of that freedom (or at a minimum, actively choosing not to deprive them of it after having the opportunity). That cannot be right. And the

[3] As Mr. Ayala observes, the government seems to have had, at a minimum, records showing that he never departed from the country after overstaying his visa. Pet's Reply to Resp't's Resp. to Order to Show Cause ("PI Reply") (dkt. 13) at 4 (quoting dkt. 6-1 at 3).

government was unable to support such an inverted conception of individual rights at the hearing on this motion. While this Court does not doubt that the decision to release an immigrant from custody can create a liberty interest, it strains credulity to imagine that this is the only route to such an interest. An interest in liberty that could only be bestowed by the government would provide little comfort to those seeking protection from its abuses.

The government again raises its concern that finding Mr. Ayala has a liberty interest will "provide every noncitizen who enters the United States pursuant to a temporary visa with the same liberty interest." PI Resp. at 9 (quoting TRO Resp. at 9). But, as this Court explained in its TRO Order, Order at 5, due process rights are inherently "flexible" and procedural protections vary "as the particular situation demands." Mathews, 424 U.S. at 344 (quoting Morrissey, 408 U.S. at 471). The many factors that support this Court's conclusion that Mr. Ayala has a liberty interest in his freedom—including his long-term residency in a single community, his sustained employment, and his strong community ties—are specific to Mr. Ayala. While other courts may find liberty interests in similar situations, the flexibility of due process rights means there is no guarantee they will, or requirement they must. The government's concerns are overblown.

The Court thus concludes that Mr. Ayala has a significant liberty interest in his continued freedom.

**2. Risk of Erroneous Deprivation**

"Once a liberty interest is established, the question is whether process—a hearing—would lessen the risk of an erroneous detention." Claros, 811 F. Supp. 3d at 1069. Of course it would. "'[T]he risk of an erroneous deprivation [of liberty] is high' where, as here, '[the petitioner] has not received any bond or custody redetermination hearing.'" See Singh v. Andrews, 803 F. Supp. 3d 1035, 1046 (E.D. Cal. 2025) (quoting A.E. v. Andrews, No. 25-cv-00107-KES-SKO, 2025 WL 1424382, at *5 (E.D. Cal. May 16, 2025)). That is because without a pre-deprivation hearing—"one of the most basic due process protections"—"neither party will have had an opportunity to determine whether there is any valid basis for the petitioner's detention." Duong v. Kaiser, 800 F. Supp. 3d 1030,

1040 (N.D. Cal. 2025).

Civil immigration detention is "nonpunitive," Zadvydas, 553 U.S. at 690, and thus detention prior to a removal proceeding is only justified where immigrants "pose [1] flight risks or [2] dangers to the community," Rodriguez Vazquez, 183 F.4th at 1165. But through two rounds of briefing, the government have not tried to argue Mr. Ayala is either. See generally TRO Resp.; PI Resp. This is understandable, since the available factual record makes such a conclusion untenable. Where an individual has "substantial ties to the community," concerns that they will flee are "mitigated." Harrington v. Albarran, No. 26-cv-01889-JST, 2026 WL 800113, at *1 (N.D. Cal. Mar. 23, 2026) (citing the IJ findings); see Rodriguez v. Hernandez, No. 26-cv-02076-TL, 2026 WL 2432725, at *5 (W.D. Wash. Aug. 6, 2026) (collecting cases finding that "where a Petitioner has a minor child who is a citizen of the United States, other family members in the area, steady employment, and community connections, they are not a flight risk"). Mr. Ayala checks every box: he has continuous and long-term residency in the area, sustained employment, local ties, and a partner who lives in the community.[4] Pet. ¶¶ 47–50. Nor is there evidence Mr. Ayala is a threat to the community. He has no criminal record, either in the United States or elsewhere. TRO Mem. at 7; see Chuquillanqui v. Kaiser, No. 25-cv-06320-TLT, 2025 WL 4110424, at *9 (N.D. Cal. Oct. 2, 2025) (noting a Petitioner had "no criminal history" in determining he is not a flight risk); G.S. v. Bostock, No. 25-cv-01255-JNW-TLF, 2025 WL 3014274, at *9 (W.D. Wash. Oct. 8, 2025) (same); L.M. v. Noem, No. 25-cv-02194-RFB-BNW, 2026 WL 103231, at *13 (D. Nev. Jan. 14, 2026) (same). "Providing [Mr. Ayala] with a pre-detention hearing will help ensure any future detention is lawful." See A.F.A.M. v. Albarran, No. 25-cv-10492-AMO, 2025 WL 3752190, at *4 (N.D. Cal. Dec. 22, 2025).

[4] The Court wrote in its TRO Order that Mr. Ayala's children reside in the United States. Order at 6. It did so in reliance on the Petition's statement that Mr. Ayala has "lived with, cared for and supported his partner and minor children in the United States." Pet. ¶ 48. The Court acknowledges, however, that the government's response contests this claim. PI Resp. at 2. Given this ambiguity, the Court clarifies that whether Mr. Ayala's children live locally is not dispositive for any of the analysis in this Order.

In addition, the Court rejects Respondents' contention that Mr. Ayala need not get a pre-deprivation hearing, because a post-deprivation hearing will do. See TRO Resp. at 6 (relying on Rodriguez Diaz v. Garland, 53 F.4th 1189, 1196–97 (9th Cir. 2022)). Respondents' argument runs contra to the many cases where courts have found pre-deprivation hearings were necessary before an individual could be re-detained. See, e.g., M.R.R. v. Chestnut, No. 1:25-cv-01517-JLT-SKO, 2025 WL 3265446, at *11 (E.D. Cal. Nov. 24, 2025) (holding that while "there may be situations that urgently require arrest, in which a prompt post-deprivation hearing is appropriate," pre-deprivation hearings are more likely required where the alleged violation is minor); Guillermo M. R., 791 F. Supp. 3d at 1036 ("[A]bsent evidence of urgent conditions, a pre-deprivation hearing is required to satisfy due process."); Romero v. Kaiser, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[D]ue process requires a hearing before an IJ prior to re-detention."). The liberty interest here is no lesser and so the same logic applies. And the baseline standard in favor of hearings prior to a rights deprivation remains. See Zinermon v. Burch, 494 U.S. 113, 127 (1990) ("the Constitution requires some kind of a hearing before the State deprives a person of liberty or property."); see also Garro Pinchi, 792 F. Supp. 3d at 1033 ("Each of the three Mathews factors supports Ms. Garro Pinchi's constitutional right to a hearing before a neutral decisionmaker prior to any future detention.").

While the government relies heavily on Rodriguez Diaz's holding that § 1226(a)'s "numerous levels of review" satisfy due process, 53 F.4th at 1210, this Court agrees with Petitioner that the case is distinguishable. Rodriguez Diaz dealt with the question of whether Mr. Rodriguez Diaz, who had accumulated "a fairly lengthy criminal record," and who had already been denied bond once, was entitled to "a second bond hearing at which the government bears the burden of proof by clear and convincing evidence." Id. at 1194, 1203. And the Court was careful to cabin its holding, writing that it did "not foreclose all as-applied challenges to §1226(a)'s procedures" and that "deficiencies in individual §1226(a) proceedings . . . may be redressable through means" less dramatic than those

United States District Court
Northern District of California

sought by Mr. Rodriguez Diaz.

The risk of an erroneous deprivation without a pre-deprivation hearing is therefore high.

**3. Government Interest**

Courts must consider the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335.

As in Garro Pinchi, 792 F. Supp. 3d at 1036, there is "no countervailing government interest . . . that supports conducting a bond hearing only after [Mr. Ayala] has been detained, rather than in advance thereof." Respondents' present no explanation for why their "interests [in detaining Petitioner] must be satisfied immediately," far be it one that outweighs the risk of an ongoing and erroneous deprivation of constitutional rights. See E.A. T.-B v. Wamsley, 795 F. Supp. 3d 1316, 1324 (W.D. Wash. 2025). And a generalized interest in "preventing noncitizens from remaining in the United States in violation of the law" is "not threatened if a pre-deprivation hearing is required." Id. Meanwhile, the fiscal and administrative burdens of a pre-deprivation hearing are insignificant. See Garro Pinchi, 792 F. Supp. 3d at 1036 ("Nor can the government suggest that the cost of providing such protections would be fiscally or administratively onerous."); Singh, 2025 WL 1918679, at *8 ("In immigration court, custody hearings are routine and impose a minimal cost."). If the government wishes to re-detain Mr. Ayala under the terms of the TRO or the preliminary injunction, it has every means of doing so. It need only provide Mr. Ayala with a routine custody determination before a neutral adjudicator.

The government's interests here are minimal.

**4. Conclusion as to Mathews Factors**

The Mathews factors thus weigh in Mr. Ayala's favor, and he has shown a likelihood of success on his procedural due process claim.

### B. Other Winter Factors

Mr. Ayala has also demonstrated a likelihood of irreparable injury in the absence of preliminary relief. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Hernandez, 872 F.3d at 994 (quoting Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)). The Ninth Circuit has specifically recognized "the irreparable harm imposed on anyone subject to immigration detention." Id. at 995. For someone like Mr. Ayala, who risks heart attack when deprived treatment for his severe sleep apnea, these harms are only amplified by the "subpar medical . . . care in ICE detention facilities." See id. at 995.

The balance of the equities and public interest, which merge in this case, also favor granting a preliminary injunction. "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." Jorge M. F. v. Wilkinson, No. 21-cv-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021) (cleaned up); see Melendres, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation omitted)); Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). As other courts in this district and beyond have concluded under similar circumstances, "the potential harm to [Mr. Ayala] is significant, while the potential harm to the government is minimal." Pablo Sequen v. Kaiser, 793 F. Supp. 3d 1114, 1120 (N.D. Cal. 2025). At most, the government faces a short delay in detaining Mr. Ayala if it ultimately demonstrates that his detention is appropriate. The government is also not "harmed in any legally cognizable sense by being enjoined from constitutional violations." Zepeda v. U.S. Immigr. & Nat. Serv., 753 F.2d 719, 727 (9th Cir. 1983).

Faced with "a conflict between [administrative] concerns and preventable human suffering, [the Court has] little difficulty concluding that the balance of hardships tips

United States District Court
Northern District of California

decidedly in [Mr. Ayala's] favor." Hernandez, 872 F.3d at 996 (quoting Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983)).[5]

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS the motion for a preliminary injunction. Respondents, and their officers, agents, employees, attorneys, and any person acting in concert with them, or at their behest, and who has knowledge of this Order is ENJOINED from detaining Petitioner without a pre-detention hearing before a neutral decisionmaker. Respondents are further ENJOINED from removing Petitioner from this district during the pendency of these habeas proceedings.

For the foregoing reasons,

**IT IS SO ORDERED.**

Dated: September 15, 2026

CHARLES R. BREYER
United States District Judge

[5] The government re-raises its exhaustion argument in its PI briefing. See PI Resp. at 14–16. Again, this Court rejects this argument, mainly because due process challenges are precisely "the sort of constitutional challenge that is 'beyond the competence of that [agency] to decide.'" See Norberto C.M., 2026 WL 1992747, at *4 (quoting Zamorano v. Garland, 2 F.4th 1213, 1224 (9th Cir. 2021)). Exhaustion is prudential for habeas petitions. Id. at *3. And "[a]n exception to the requirement has been carved for constitutional challenges to . . . [DHS] procedures." Andriasyan, 2026 WL 1850059 at *3 (quoting Sola v. Holder, 720 F.3d 1134, 1135 (9th Cir. 2013) (per curium)). Further, where a petitioner's claims "concern the constitutionality of an agency action prior to the bond hearing," they fall beyond the jurisdiction of the Board of Immigration Appeals and "requiring administrative exhaustion would be futile." Id.